**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Timothy M. Francis &
Tammy A. Francis

       v.                            Civil No. 06-cv-480-JM

Lindon L. Pulley

**O R D E R**

Plaintiffs Timothy and Tammy Francis (hereinafter,
collectively, "plaintiffs" or "the Francises" and individually,
"Timothy" and "Tammy") sought a preliminary injunction enjoining
the defendant, Lindon Pulley (hereinafter "Pulley" or
"defendant"), from transferring any real estate or real property
in the defendant's possession, or in which the defendant has an
interest.  An evidentiary hearing was held on plaintiffs' motion
on January 5, 2007.  Defendant did not appear at the hearing.[1]
After the hearing, I issued an order granting plaintiffs' motion
and enjoining the defendant from selling, or transferring any

---

[1]It is the Court's understanding, based on the
representations made by plaintiffs' counsel at the evidentiary
hearing, that defendant received in-hand notice of the hearing on
January 3, 2007.  Defendant has neither objected to this motion
nor requested a continuance of this hearing.

interest he may have, directly or indirectly, in real property or real estate, including defendant's real estate holdings in White River Junction, Vermont.  This Order supplements and clarifies the extent of my previous order granting the preliminary injunction.

<u>Background</u>

In 1999, Pulley approached his daughter Tammy, stating that he was aware of an investment opportunity that Tammy and Timothy, her husband of two months, could benefit from financially. Pulley proposed to the Francises that they put up the money to buy a restaurant equipment business from Pulley's then-girlfriend, Marilyn Tobin ("Tobin").  Pulley had previously owned a restaurant equipment business, but the business failed and Pulley had to file for bankruptcy protection.  Accordingly, Pulley had experience in the restaurant equipment business, but did not have sufficient cash or credit to purchase Tobin's business himself.

Relying on Pulley's assertions that this was a great opportunity for them to make a great deal of money, the Francises agreed to give Pulley the money to purchase Tobin's business, called Pots & Pans, Etc. (hereinafter "P&P").  Pulley purchased

P&P for $8,000.  At the time of this transaction, Tammy had a
tenth grade education and was employed in a bakery.  Timothy had
a high school education and was employed as a phone technician.
Although neither Tammy nor Timothy had any experience in
business, Tammy testified that she had an excellent relationship
with her father and that she trusted him and his experience in
business.

Pulley told the Francises that he would take care of
everything related to the operation of the business.  Pulley
maintained all of the financial documents, including checks and
bank statements, ran the business, and paid himself out of the
business account.  This all occurred with the plaintiffs'
consent.  The business itself remained in Tammy's and Timothy's
names.  Other than ownership, Tammy and Timothy were not involved
in the business at all.  The plaintiffs never received any cash
disbursements, although Pulley reported that the business was
doing fine, that it would eventually make the Francises a lot of
money, and that Pulley would make sure the Francises were taken
care of financially.

Occasionally, Pulley would present the plaintiffs with
documents to sign related to the business.  Tammy stated that

Pulley would always bring paperwork to the Francis' Massachusetts home to be signed, and that Pulley always rushed through these transactions.  Pulley would tell plaintiffs not to worry about the contents of the paperwork, that everything was fine, and did not generally give plaintiffs an opportunity to review the paperwork.  Despite this, plaintiffs routinely signed the paperwork because they trusted Pulley and did not feel they had any reason to question his behavior.

In January of 2000, plaintiffs, on Pulley's advice, bought the building, referred to in the pleadings as the "Agway Building," that housed P&P in White River Junction, Vermont for $12,500.  In May of 2002, the plaintiffs, through Pulley, purchased the property that the Agway Building sat on (the "Agway property") for $136,677.  It appears that the money for this purchase came from the business accounts owned by plaintiffs and controlled by Pulley.  The purchase of the Agway property was made through a company called South Main Street Properties ("SMS"), which appears to have been created by Pulley.  In December of 2002, as an agent of SMS, Pulley conveyed the Agway property to Tammy and Timothy individually.

In November of 2002, again on Pulley's advice, plaintiffs purchased a commercial warehouse adjacent to the Agway Building, the Freight Warehouse ("Freight Building") for $80,000.  Again, Pulley contributed no money to the transaction.

In June of 2004, plaintiffs, at the direction of Pulley, sold P&P and the Agway Building and Agway property to R&K Snaith, LLC ("Snaith") for a total of $375,000.  Timothy and Tammy were given a promissory note from Snaith for $150,000 plus interest (the "Snaith Note") that was due on July 15, 2006.  The Snaith Note was secured by the mortgage on the Agway Building.  Pulley controlled all of the money paid pursuant to the Snaith Note. The plaintiffs never received any money from the transaction or from payments made on the Snaith Note.  In October of 2005, Pulley had Tammy and Timothy assign the Snaith Note to Pulley for no consideration.

Although a settlement statement produced for the sale of P&P, the Agway Building, and the Agway property shows that $15,000 was given to plaintiffs, plaintiffs never received any payment or proceeds from the sale.  Instead, the money was received by Pulley as the plaintiffs' agent.  Further, a 2004 Chevy Silverado that had been owned by P&P was excluded from the

sale and retained by Pulley for his own use without any recompense to the plaintiffs.  The plaintiffs claim that the total profit from the sale of P&P, the Agway Building and the Agway property was $225,823, of which the plaintiffs received nothing.  Pulley is also alleged to have applied $72,989.01 of the proceeds of the sale of P&P and the Agway Building and property to a like-kind exchange transaction from which the plaintiffs received no benefit.

In October of 2004, at Pulley's direction, plaintiffs purchased another commercial warehouse in White River Junction, the Steel Warehouse ("Steel Building") from Earl Heath for $225,000.  Simultaneously with that purchase, as plaintiffs' agent, Pulley entered into leasehold agreements with three different businesses for space in the Steel Building.  The leases generated monthly rent of more than $2200.  Again, the Francises never saw any proceeds from the sale or any of the rent money.

On one occasion, one of the tenants damaged the exterior of the Steel Building.  The tenant entered into a settlement agreement with Pulley that assigned the right to the claim to the plaintiffs as the owners of the Steel Building.  The damage claim

6

was settled by Pulley for $4,500.  Pulley did not have the damage repaired and applied the funds instead to his own use.

In December of 2004, at Pulley's direction, Tammy and Timothy sold the Freight Building to a company named Execusuite, for $200,000.  The Francises did not receive any proceeds from this sale.  Plaintiffs took a promissory note from Execusuite for the sale in the amount of $75,000 (the "Execusuite Note").  The terms of the Execusuite Note called for Execusuite to make one balloon payment on July 15, 2005 of all of the principal and accrued interest.  In September of 2005, Execusuite issued a check for $73,971.24 to the plaintiffs.[2]  Pulley converted the funds for his own use and the plaintiffs received nothing.

In October of 2005, Pulley convinced the plaintiffs to sign the Steel building title over to Pulley for one dollar.  Tammy testified that she was willing to sign the building ownership to Pulley because she had become concerned about her tax liability for the building.  Pulley represented to Tammy that upon

---

[2]The record is unclear as to precisely why this amount was less than the amount of the Execusuite Note and paid later than July of 2005.  There is reference in the complaint to a dispute over personal property left in the Freight Building by Pulley after the sale to Execusuite which was not resolved until September 13, 2005.  It appears this dispute may have delayed payment on and reduced the value of the Execusuite Note.

assigning the building title to him, plaintiffs would be free and clear from any responsibility for the building, its mortgage, or the taxes on the building.  Plaintiffs later discovered, however, that while Pulley had taken ownership of the building, he had not assumed the mortgage or the tax liability, both of which remained with the plaintiffs.

According to the documents entered into evidence at the hearing, see Ex. 2, when Pulley obtained ownership of the building, he filed a Vermont property tax return certifying that the transfer was without consideration.  Later, Pulley sought to amend that document to indicate that the fair market value of the Steel Building, $310,000, was paid as consideration, in order to minimize capital gains taxes that would be owed on a subsequent sale of the Steel Building.  Pulley then had a promissory note drafted in the amount of $243,824.41 for the plaintiffs' benefit (the "Pulley Note"), ostensibly to secure Pulley's financial obligation to the plaintiffs.

On December 15, 2005, Pulley had an attorney draft a gift letter stating that Tammy and Timothy were each gifting Pulley $12,000, for a total of $24,000, of the principal owed.  On December 31, 2005, Pulley had the gift letter amended to forgive

$22,000 instead of $24,000, so that no gift tax return had to be filed.

In June of 2006, Pulley had an accountant draft a gift tax return for the plaintiffs' to sign, gifting Pulley $158,100 each, for a total of $316,200.  This would have forgiven the entire amount due to plaintiffs under the Pulley Note.  Pulley presented the plaintiffs with the gift documents to sign and insisted that they be immediately executed.  At this point, however, Tammy had become suspicious of her father's actions, and decided to have the gift tax returns examined by her own accountant prior to signing them.  Once Tammy obtained the advice of an accountant, she understood that she and Timothy were being asked to gift their entire interest in the Steel Building, which at that time constituted the entirety of the returns on the business investments they had made, to her father's benefit without any consideration at all.  Further, she would retain liability for the mortgage and taxes on the Steel Building.  Tammy also learned that all of the business tax returns filed since 2000 had been filed in the plaintiffs' names, and that accordingly, plaintiffs had paid in excess of $21,000 more in taxes over those years than they otherwise would have owed, without receiving any benefit

from the business.  Upon learning these facts, plaintiffs did not sign the gift tax return documents.  Accordingly, Pulley, it appears, is still bound by the terms of the Pulley Note, which is secured by Pulley's interest in the Steel Building.

Pulley continued to badger the plaintiffs to sign the documents and ultimately, Tammy lied to Pulley, telling him the documents were signed in order to stop the badgering.  At the point when he believed the gift tax returns had been signed, Pulley's demeanor toward the plaintiffs became hostile.

In the meantime, in September of 2005, a friend of Tammy's offered to sell Tammy a minivan for $9000.  Tammy and Timothy were having financial trouble as Tammy had stopped working outside of the home in 2004 in order to care for the Francises' two small children.  The Francises had only one vehicle and no reliable transportation for Tammy to use.  Due to the plaintiffs' financial difficulties, Pulley offered to register the van in his own name, use the business account to pay for the van, and also to register and insure it, with the business account money, in his own name.  The plaintiffs accepted that offer and obtained the van on those terms.  During the course of the following year, Tammy loaned the van to her father on several occasions.  On the

10

last of these occasions, Pulley took the van on a trip to Canada. While in Canada, at about the same time he believed that the final gift transaction was transpiring between himself and the plaintiffs, Pulley learned that Tammy had requested copies of tax returns and bank statements relating to the business and property transactions that the plaintiffs had invested in.  Pulley became enraged and refused to return the minivan.  Since that time, the plaintiffs have been without a second vehicle.

The plaintiffs have learned that Pulley is seeking to sell the Steel Building.  According to the plaintiffs, they had learned that the Steel Building was under agreement for sale at the time that the property was attached pursuant to this Court's temporary restraining order enjoining such transfer.

## Standard of Review

Preliminary injunctive relief is available to protect the movant from irreparable harm, so that the movant may obtain a meaningful resolution of the dispute after full adjudication of the matter.  Such a situation arises when some harm from the challenged conduct could not be adequately redressed with traditional legal or equitable remedies following a trial.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18

(1st Cir. 1996) (finding irreparable harm where legal remedies are inadequate); see also Acierno v. New Castle County, 40 F.3d 645, 653 (3rd Cir. 1994) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").  Absent irreparable harm, there is no need for a preliminary injunction.

Alleging a mere possibility that a defendant might not be able to ultimately satisfy a judgment because, at the time such judgment is entered, he may not have assets is not sufficient to demonstrate irreparable injury for preliminary injunction purposes.  See Micro Signal Research, Inc. v. Otus, 417 F.3d 28, 31 (1st Cir. 2005).  However, "where there is a strong indication that the defendant may dissipate or conceal assets," preliminary injunctive relief may be warranted.  Id.

The purpose of preventing irreparable harm is to enable the court to render a meaningful disposition on the underlying dispute.  See CMM Cable Rep. v. Ocean Coast Props., 48 F.3d 618, 620 (1st Cir. 1995) (explaining the purpose of enjoining certain

conduct as being to "preserve the 'status quo' . . . to permit
the court, upon full adjudication of the case's merits, more
effectively to remedy discerned wrongs."); see also Becton v.
Thomas, 48 F. Supp. 2d 747, 753 (W.D. Tenn. 1999) ("'The purpose
of a preliminary injunction is always to prevent irreparable
injury so as to preserve the court's ability to render a
meaningful decision on the merits.'") (quoting Stenberg v. Cheker
Oil Co., 573 F.2d 921, 925 (6th Cir. 1978)).  The court's focus,
therefore, must always be on the underlying merits of the case,
and what needs to be done to ensure that the dispute can be
meaningfully resolved.

A preliminary injunction cannot issue unless the moving
party satisfies four factors which establish its need for such
relief.  See Esso Standard Oil Co. v. Monroig-Zavas, 445 F.3d 13,
17-18 (1st Cir. 2006) (discussing the requisite showing to obtain
a preliminary injunction); see also Ross-Simons, 102 F.3d at 18-
19 (explaining the burden of proof for a preliminary injunction).
Those factors are:  "(1) the likelihood of success on the merits;
(2) the potential for irreparable harm [to the movant] if the
injunction is denied; (3) the balance of relevant impositions,
i.e., the hardship to the nonmovant if enjoined as contrasted

with the hardship to the movant if no injunction issues; and (4)
the effect (if any) of the court's ruling on the public
interest."  <u>Esso Standard</u>, 445 F.3d at 18.  If the plaintiff is
not able to show a likelihood of success on the merits, the
remaining factors "become matters of idle curiosity," <u>id.</u> at 18,
insufficient to carry the weight of this extraordinary relief on
their own.  <u>See</u> <u>id.</u> (the "sine qua non of this four-part inquiry
is likelihood of success on the merits") (internal quotation
omitted).  Yet, "the predicted harm and the likelihood of success
on the merits must be juxtaposed and weighed in tandem."  <u>Ross-
Simons</u>, 102 F.3d at 19.  A "strong showing of likely success on
the merits reduces, but does not eliminate, the showing of
irreparable harm that plaintiffs must make to obtain preliminary
injunctive relief."  <u>Biogen Idec MA Inc. v. Trs. of Columbia
Univ. in N.Y.</u> 332 F. Supp. 2d 286, 289 (D. Mass. 2004).

### <u>Discussion</u>

#### <u>The Four Preliminary Injunction Factors</u>

1.   <u>Likelihood of Success on the Merits</u>

The plaintiffs have stated seven claims based upon state
tort law[3] upon which they assert relief might be granted: (1)

---

[3]As the plaintiffs live in Massachusetts and the defendant
lives in New Hampshire and the amount in controversy in this

14

deceit/misrepresentation, (2) breach of fiduciary duties, (3)

undue influence, (4) constructive trust for unjust enrichment,

(5) breach of implied covenant of good faith and fair dealing,

(6) conversion, and (7) improper accounting.  Because I find that

the plaintiffs are likely to succeed on at least one of these

claims, constructive trust for unjust enrichment, I will not

address the merits of the other claims at this time.

Under New Hampshire law, "[n]o rigid requirements exist for

imposing a constructive trust." In re Estate of Cass, 143 N.H.

57, 60, 719 A.2d 595, 598 (1998).  Rather,

> [a] constructive trust may be imposed when clear
> and convincing evidence shows that a confidential
> relationship existed between two people, that one
> of them transferred property to the other, and that
> the person receiving the property would be unjustly
> enriched by retaining the property, regardless of
> whether the person obtained the property honestly.

Id.  A "family relationship in which one person justifiably

believes that the other will act in his or her interest" is a

confidential relationship.  In re Estate of McIntosh, 146 N.H.

474, 479, 773 A.2d 649, 653 (2001), citing Cass, 143 N.H. at 60.

Unjust enrichment occurs when a person obtains the title to

---

action exceeds $75,000, this is a diversity action that is within
this Court's jurisdiction pursuant to 28 U.S.C. § 1332.
Accordingly, the claims alleged arise in New Hampshire tort law.

property by "fraud, duress, or undue influence" or through
violation of a fiduciary duty owed to the grantor.  Cass, 143
N.H. at 60.

   Whether or not undue influence exists is a factual decision
based on the court's consideration of the relationship between
the parties and all of the relevant circumstances surrounding the
incident or transaction in question.  Id. at 61.  To that end,
the court examines the relationship itself, the physical and
mental condition of the party claiming to have been unduly
influenced, the reasonableness and nature of the disposition, and
the personalities of the parties.  Id.

   The plaintiffs have submitted evidence of a constructive
trust claim.  A confidential relationship existed between Pulley
and the Francises.  Pulley is Tammy's father and Tammy testified
that the two were very close, spoke at least once a day prior to
all of these allegations, and that she trusted him implicitly.
Because Timothy was Tammy's husband at the time of this
transaction in question, I find that Timothy too was in a
confidential relationship with Pulley.  Further, there was a
transfer of property.  Plaintiffs transferred ownership of the

16

Steel Building to Pulley in exchange for a dollar and a promissory note.

To claim a constructive trust with unjust enrichment, plaintiffs must demonstrate that Pulley would be unjustly enriched by retaining the property.  Id.  Plaintiffs can demonstrate unjust enrichment if they can show that Pulley obtained the title to the Steel Building by fraud, duress or undue influence.  Id.

To show that the title was obtained by undue influence, the plaintiffs must demonstrate circumstances from which the Court can conclude that either the influence exerted over the plaintiffs must amount to force or coercion that alters the plaintiffs' will, and must be more than the influence of affection.  Id.  On the other hand, if Pulley was acting as a fiduciary agent of the plaintiffs, Pulley has the burden of proving an absence of undue influence.  Id.  Here, while it appeared that Pulley may have used threatening behavior later in the relationship, there is no evidence that Pulley forced or coerced the plaintiffs to transfer title in the Steel Building to him, or to sign the gift tax returns forgiving the Pulley Note. In fact, the complaint specifically indicates that Pulley's

hostility occurred after he thought the gift tax return was signed.

While the evidence presented at the hearing indicates that the influence over the plaintiffs' business decisions was based on the affection and trust shared between a father and a daughter, it was also clear at the hearing that, by placing himself in a position of exclusive control of the business, including its finances and accounting, that Pulley acted in a fiduciary capacity and had a duty to act in the financial interest of the plaintiffs.  As such, the onus was on Pulley to demonstrate that there was no undue influence at work in effecting the transfer of the Steel Building.  Because Pulley did not appear at the hearing, no such evidence was presented on his behalf.  Accordingly, I find that the plaintiffs sufficiently alleged undue influence to have demonstrated that they are likely to be able to prove that a constructive trust existed, and that Pulley was unjustly enriched as a result.  Therefore, I find that the plaintiffs have demonstrated a likelihood of success on the merits of at least one claim in their complaint.

2.   <u>Irreparable Harm</u>

The Supreme Court has held that, ordinarily, injunctive relief interfering with a debtor's use of his own property cannot be granted to a non-judgment creditor seeking money damages. <u>Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308, 321 (1999).  The Court in <u>Grupo Mexicano</u>, however, also noted that this rule might not apply where a creditor holds or asserts an "equitable lien" on the defendant's property.  <u>Id.</u> at 326.

Here, plaintiffs have demonstrated that they hold a promissory note executed by Pulley in consideration of their conveyance of the Steel Building to Pulley, and that the note is secured by the Steel Building.  Further, they have alleged that Pulley is attempting to sell the Steel Building for his own benefit.  Accordingly, it is arguable that the reasoning of <u>Grupo Mexicano</u> might not apply in this situation, as plaintiffs have demonstrated the minimum facts necessary to show that they hold an equitable interest in the property that is the subject of the motion for injunctive relief.  <u>See</u> <u>Charlesbank Equity Fund II v. Blinds To Go, Inc.</u>, 370 F.3d 151, 159 (1st Cir. 2004) (finding that under <u>Grupo Mexicano</u>, a District Court has "no authority to

issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages <u>where no preexisting lien or equitable interest [has] been claimed</u>" and finding that "it is at least arguable that the existence of a security interest . . . is a salient distinction." (emphasis added)).[4]

Here, plaintiffs argue that, at a minimum, they hold an equitable interest in the Steel Building, or any assets that may derive from the sale of that building.  Therefore, the plaintiffs can demonstrate irreparable harm to their interests if Pulley is not enjoined from disposing of or otherwise transferring the Steel Building or the proceeds from its sale.

While the plaintiffs also argue that they are owed money from business transactions from which they should have benefitted financially, they have not undertaken to demonstrate any

---

[4]Further, the Fourth Circuit has recently held that when "both monetary damages and equitable relief are sought . . ., the controlling authority is not <u>Grupo</u> but <u>Deckert v. Independence Shares Corp.</u>, 311 U.S. 282 (1940)." <u>Rahman v. Oncology Assocs. P.C.</u>, 198 F.3d 489, 492 (4th Cir. 1999).  The <u>Rahman</u> Court also found that application of the holding in <u>Grupo Mexicano</u> is properly limited to actions solely at law.  <u>Id.</u> at 496.  Here, plaintiffs seek both compensatory and injunctive relief. Accordingly, I find that preliminary injunctive relief is appropriate on that basis.

equitable interest in that money.  Accordingly, I cannot find that it is the proper subject of a preliminary injunction.

3.   <u>The Balance of Relevant Impositions</u>

Pulley did not appear at the hearing on this matter. Accordingly, no evidence is before the Court regarding any hardship or imposition that would accrue to Pulley if this injunction issues.  The plaintiffs have demonstrated that their efforts to pursue a remedy against Pulley for unjustly enriching himself by disposing of a building in which they hold an equitable interest would be significantly impinged if this injunction fails to issue.  Accordingly, I find that this factor weighs in favor of issuing the injunction.

4.   <u>The Effect of the Court's Ruling on the Public Interest</u>

While this is a private dispute concerning private property, the public is always interested in this Court protecting the rights of the litigants to appropriate remedies if those litigants can present legally sufficient evidence that they are entitled to relief.  Accordingly, I find that the issuance of this Order comports with the public interest in obtaining fair remedies to legal disputes.

21

Conclusion

For the foregoing reasons, I reaffirm my issuance of a preliminary injunction in this matter, under the terms previously set forth in my Order granting plaintiffs' motion for injunctive relief (document no. 6) to the extent that it seeks to enjoin defendant from selling, or transferring any interest he may have, directly or indirectly, in the Steel Building as identified herein, or disposing of any proceeds Pulley may have received from the sale of the Steel Building in White River Junction, Vermont.

**SO ORDERED.**

James R. Muirhead
United States Magistrate Judge

Date:      January 10, 2007

cc:        Michael G. Furlong, Esq.
           John J. LaRivee, Esq.
           Lindon L. Pulley, pro se

22